Michael R. Lozeau (State Bar No. 142893)
Richard Drury (State Bar No. 163559)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>      Plaintiff,<br><br>   vs.<br><br>HANSON PIPE & PRECAST LLC, a Texas Limited Liability Company,<br><br>     Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, by and through its

counsel, hereby alleges:

I.      **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the

Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this

action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. §

1331 (an action arising under the laws of the United States).  The relief requested is authorized

pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual

controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b),

COMPLAINT

1

1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On August 6, 2014, Plaintiff provided notice to Defendant of its violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 120, intradistrict venue is proper in Sacramento, California, because the source of the violations is located within Sacramento County.

## II.    INTRODUCTION

5.      This complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's industrial facility located at 7020 Tokay Avenue in Sacramento, California ("Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other

COMPLAINT

procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

III.     **PARTIES**

        6.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Mokelumne River and the Sacramento-San Joaquin River Delta (the "Delta").  CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.  CSPA brings this action on behalf of its members.  CSPA's interest in reducing Defendant's discharges of pollutants into the Delta and the Mokelumne River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CSPA.

        7.      Members of CSPA reside in and around Florin Creek, the Mokelumne River, and the Delta and enjoy using those waters for recreation and other activities.  One or more members of CSPA use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  One or more members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife and engage in scientific study including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of one or more of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

8.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

9.      Defendant Hanson Pipe & Precast LLC (hereinafter "Defendant" or "River City") is a Texas-based Limited Liability Company.

## IV.     STATUTORY BACKGROUND

10.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

12.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits, including general NPDES permits, in California.

13.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  On April 1, 2014, the State Board reissued the General Permit. State Board Order 2014-0057-DWQ.  The reissued version of the General Permit does not go into effect until July 1, 2015.  Until that time, the April 17, 1997 General Permit remains in full force and effect.

14.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

15.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

17.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires an initial SWPPP to have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the

COMPLAINT

5

1  facility and identify and implement site-specific best management practices ("BMPs") to

2  reduce or prevent pollutants associated with industrial activities in storm water and

3  authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement

4  BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and

5  their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map

6  showing the facility boundaries, storm water drainage areas with flow pattern and nearby

7  water bodies, the location of the storm water collection, conveyance and discharge system,

8  structural control measures, impervious areas, areas of actual and potential pollutant contact,

9  and areas of industrial activity (Section A(4)); a list of significant materials handled and

10  stored at the site (Section A(5)); a description of potential pollutant sources including

11  industrial processes, material handling and storage areas, dust and particulate generating

12  activities, a description of significant spills and leaks, a list of all non-storm water discharges

13  and their sources, and a description of locations where soil erosion may occur (Section A(6)).

14  The SWPPP must include an assessment of potential pollutant sources at the Facility and a

15  description of the BMPs to be implemented at the Facility that will reduce or prevent

16  pollutants in storm water discharges and authorized non-storm water discharges, including

17  structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The

18  SWPPP must be evaluated to ensure effectiveness and must be revised where necessary

19  (Sections A(9),(10)).

20       18.     Section C(11)(d) of the General Permit's Standard Provisions requires

21  dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6).

22  Section A(9) of the General Permit requires an annual evaluation of storm water controls,

23  including the preparation of an evaluation report and implementation of any additional

24  measures in the SWPPP to respond to the monitoring results and other inspection activities.

25       19.     The General Permit requires dischargers commencing industrial activities

26  before October 1, 1992 to develop and implement an adequate written monitoring and

27  reporting program no later than October 1, 1992.  Existing facilities covered under the

28  General Permit must implement all necessary revisions to their monitoring programs no later

COMPLAINT

than August 1, 1997.

20.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to collect and analyze samples during the wet season for basic parameters, including pH, total suspended solids, electrical conductance, and total organic compounds or oil & grease, as well as certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires dischargers to sample for parameters dependent on a facility's standard industrial classification ("SIC") code.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

21.     The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described.  This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and

COMPLAINT

associated drainage area."  Section A(6)(a)(v).  The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that BMPs are included in the SWPPP to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain records of such observations.

22.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

23.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

24.     The Regional Board has established water quality standards for the Mokelumne River and its tributaries as well as the Delta in the Water Quality Control Plan for the Sacramento and San Joaquin River Basins, generally referred to as the Basin Plan.

25.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

26.     The Basin Plan includes a narrative oil and grease standard which states that

"[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."

27.     The Basin Plan provides that the pH "shall not be depressed below 6.5 nor raised above 8.5."

28.     The Basin Plan provides that "[w]ater shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses."

29.     The Basin Plan provides that "[w]aters shall be free of discoloration that causes nuisance or adversely affects beneficial uses."

30.     The Basin Plan provides that "[w]aters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses."

31.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels ["SMCLs"]-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449…[a]t a minimum, water designated for use as [MUN] shall not contain lead in excess of 0.015 mg/l." Table 64449-A provides an SMCL for iron of 0.3 mg/L.

32.     The Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L and for zinc of 0.1 mg/L.

33.     The EPA has adopted freshwater numeric water quality standards for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC"). 65 Fed.Reg. 31712 (May 18, 2000) (California Toxics Rule).

34.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the

requisite BAT and BCT.  EPA has established Parameter Benchmark Values for the following parameters, among others:  pH – 6.0 – 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L, oil & grease ("O&G") – 15 mg/L, iron – 1.0 mg/L, lead – 0.095 mg/L, and zinc – 0.13 mg/L.  The values for zinc and lead are hardness dependent, and correspond to a total hardness of 100-125 mg/L, which is the default listing in the California Toxics Rule.

35.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

**V.     STATEMENT OF FACTS**

36.     Defendant operates an industrial facility at 7020 Tokay Avenue in Sacramento, California.  On information and belief, CSPA alleges that the Facility is engaged in the manufacturing of pipes and precast concrete products.  The Facility falls within SIC code 3272.  Approximately half of the facility is Facility is unpaved, and large portions of the Facility are used for manufacturing and storing pipe and precast concrete products.  On information and belief, Plaintiff alleges that there are at least two buildings located on the property.  Plaintiff is informed and believes, and thereupon alleges, that manufacturing and storage of pipe and precast concrete products occurs both inside and outside of these buildings.

37.     Defendant collects and discharges storm water falling on the Facility through at least four outfalls.  The Facility's outfalls discharge to channels that flow to Florin Creek, which flows into Morrison Creek, which flows into the Mokelumne River, and then into the Delta.

38.     Plaintiff is informed and believes, and thereupon alleges, that the industrial

COMPLAINT

1   activities conducted at the Facility include the manufacturing of pipes and precast concrete

2   products, including the storage and processing of raw materials associated with said

3   manufacturing and the discharge of waste products associated with said manufacturing.

4        39.    The majority of the industrial activities at the Facility take place outside and

5   are exposed to rainfall.  These outside areas are exposed to storm water and storm flows due

6   to the lack of overhead coverage, berms, and other storm water controls.

7        40.    Industrial machinery, heavy equipment and vehicles, including trucks,

8   forklifts, and cranes, are operated at the Facility in areas exposed to storm water flows.

9   Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment

10  leak contaminants such as oil, grease, diesel fuel, coolant, and hydraulic fluids that are

11  exposed to storm water flows, and that such machinery and equipment track sediment and

12  other contaminants throughout the Facility.  On information and belief, Plaintiff alleges that

13  trucks leaving the Facility track substantial amounts of material onto adjoining public roads.

14  During rain events, material that has been tracked from the Facility onto public roads during

15  dry weather is transported via storm water to storm drain channels.

16       41.    Plaintiff is informed and believes, and thereupon alleges, that storm water

17  flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease,

18  metals, and other pollutants as it flows to the Facility's outfalls, and towards channels that

19  flow to Florin Creek, which flows into Morrison Creek, which flows into the Mokelumne

20  River, and then into the Delta.

21       42.    The management practices at the Facility are wholly inadequate to prevent the

22  sources of contamination described above from causing the discharge of pollutants to waters

23  of the United States.  The Facility lacks sufficient structural controls such as grading,

24  berming, roofing, containment, or drainage structures to prevent rainfall and storm water

25  flows from coming into contact with these and other exposed sources of contaminants.  The

26  Facility lacks sufficient structural controls to prevent the discharge of water once

27  contaminated, and lacks adequate storm water pollution treatment technologies to treat storm

28  water once contaminated.  The Facility lacks controls to prevent the tracking and flow of

COMPLAINT

11

pollutants onto the adjacent public road.

43.     Since at least October 13, 2009, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board.  Defendant certified each of those annual reports pursuant to Sections A and C of the General Permit.

44.     Since at least October 13, 2009, iron has been detected in storm water discharged from the Facility.  Since at least April 20, 2010, TSS has been detected in storm water discharged from the Facility.  Since at least February 29, 2012, zinc has been detected in storm water discharged from the Facility.  Levels of these pollutants detected in the Facility's storm water have been in excess of applicable water quality standards established in the Basin Plan.  Levels of these pollutants detected in the Facility's storm water have also been in excess of EPA's numeric parameter benchmark values.

45.     The following discharges on the following dates contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan and/or the California Toxics Rule:

| Date | Parameter | Observed Concentration/ Conditions | Basin Plan Water Quality Objective/ EPA California Toxics Rule | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 4/4/2013 | pH | 8.65 s.u. | 6.5 – 8.5 s.u. | #3 Parking lot south entrance |
| 11/28/2012 | pH | 8.51 s.u. | 6.5 – 8.5 s.u. | Outfall 2 (Entrance - SE Corner) |
| 2/29/2012 | pH | 8.53 s.u. | 6.5 – 8.5 s.u. | Outfall 2 (Entrance - SE Corner) |
| 2/29/2012 | pH | 8.95 s.u. | 6.5 – 8.5 s.u. | Outfall 3 (Parking Lot) |
| 4/1/2014 | Iron | 12 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 2 (Entrance – SE Corner) |
| 4/1/2014 | Iron | 7.7 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 3 (Parking Lot) |
| 4/4/2013 | Iron | 7.5 mg/L | 0.3 mg/L (WQO) / | #3 Parking lot south |

| | | | 0.3 mg/L (SMCL) | entrance |
|---|---|---|---|---|
| 2/29/2012 | Iron | 5.4 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 2 (Entrance – SE Corner) |
| 2/29/2012 | Iron | 13 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 3 (Parking Lot) |
| 5/25/2011 | Iron | 4.2 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 3 (Parking Lot) |
| 4/20/2010 | Iron | 3.08 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | #3 Parking lot south entrance |
| 10/13/2009 | Iron | 1.68 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | #3 Parking lot south entrance |
| 2/29/2012 | Zinc | 0.13 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | Outfall 2 (Entrance – SE Corner) |
| 2/29/2012 | Zinc | 0.21 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | Outfall 3 (Parking Lot) |
| 2/29/2012 | Narrative | Cloudy | Basin Plan at III-7.00 | East Corner east of Parking Lot Outfall #2 |
| 2/29/2012 | Narrative | Cloudy | Basin Plan at III-7.00 | Parking Lot Outfall #3 |
| 5/25/2011 | Narrative | Cloudy | Basin Plan at III-7.00 | #3 Parking Lot Outfall |

46.     The levels of pH in storm water detected by the Facility have been outside the permitted range of pH of 6.5 – 8.5 s.u. established in the Basin Plan.  For example, on April 4, 2013, the level of pH in storm water measured from one of the Facility's outfalls was 8.65 s.u.  Additional levels of pH that the Facility measured outside of this range are referenced in the above table in Paragraph 45.

47.     The levels of iron in storm water detected by the Facility have exceeded the Water Quality Objective and Secondary Maximum Contaminant Level of 0.3 mg/L for iron established by the Basin Plan.  For example, on April 1, 2014, the level of iron measured at one of the Facility's outfalls was 12 mg/L, 40 times the WQO and SMCL for iron.  Additional levels of iron that the Facility measured in excess of the WQO and SMCL for iron are referenced in the above table in Paragraph 45.

48.     The level of iron in storm water detected by the Facility has also exceeded the benchmark for iron of 1.0 mg/L established by EPA.  For example, on April 1, 2014, the

COMPLAINT

13

level of iron measured by Defendant at the Facility's outfall was 12 mg/L, 12 times the benchmark value for iron.  The Facility has also measured levels of iron in excess of 1.0 mg/L in storm water discharged by the Facility on April 4, 2013; February 29, 2012; May 25, 2011; April 20, 2010, and October 13, 2009.

49.     The levels of zinc in storm water detected by the Facility have exceeded the Water Quality Objective of 0.1 mg/L in the Basin Plan, and the freshwater numeric water quality standard of 0.12 mg/L (CMC) established by EPA.  For example, on February 29, 2012, the level of zinc measured at the Facility's outfall was 0.21 mg/L, over twice the WQO and nearly twice the CMC for zinc.

50.     The level of zinc in storm water detected by the Facility has also exceeded the benchmark for zinc of 0.13 mg/L established by EPA.  On February 29, 2012, the level of zinc measured by Defendant at one of the Facility's outfalls was 0.21 mg/L, nearly twice the benchmark value for zinc.

51.     The level of TSS in storm water detected by the Facility has exceeded the benchmark value for TSS of 100 mg/L established by EPA.  For example, on February 29, 2012, the level of TSS measured by Defendant from the Facility's outfall was 1200 mg/L. That level of TSS is 12 times the benchmark value for TSS.  Defendant has also measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L on April 1, 2014; April 4, 2013; November 28, 2012; April 20, 2010; and January 22, 2009.

52.     On information and belief, CSPA alleges that lead is likely to be present in the Facility's storm water discharges.  CSPA alleges that Defendant failed to analyze its storm water samples for lead on the following dates and associated storm water outfalls – November 28, 2012 (Outfall 2 and 3); April 20, 2010 (Outfall 2 and 3); October 13, 2009 (Outfall 3).  These are violations of Section B(5)(c)(ii) of the General Permit.

53.     On information and belief, CSPA alleges that zinc is likely to be present in the Facility's storm water discharges.  CSPA alleges that Defendant failed to analyze its storm water samples for zinc on the following dates and associated storm water outfalls – November 28, 2012 (Outfall 2 and 3); April 20, 2010 (Outfall 2); October 13, 2009 (Outfall

3).  These are violations of Section B(5)(c)(ii) of the General Permit.

54.     Facilities with the SIC Code 3272, including Defendant's Facility, are required to analyze storm water samples for iron.  On information and belief, CSPA alleges that Defendant failed to analyze its storm water samples for iron on November 28, 2012 at Outfall 2 and Outfall 3.  These are violations of Section B(5)(c)(iii) of the General Permit.

55.     On information and belief, Plaintiff alleges that, on several occasions, Defendant conducted its monthly visual observations of storm water discharges on days when no rain occurred, although rain fell on other work days during that month.  Visual monitoring of discharges on dry dates is not a wet weather inspection as required by Section B(4) of the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant failed to conduct monthly visual observations of storm water discharges during wet weather in February 2010, November 2010, January 2011, November 2011, December 2011, January 2012, March 2012, April 2012, October 2012, December 2012, January 2013, February 2013, March 2013, and May 2013.

56.     On information and belief, Plaintiff alleges that since at least August 7, 2009, Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, iron, zinc, and lead.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants, and BCT for conventional pollutants, by no later than October 1, 1992, or the date that the Facility was opened.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

57.     On information and belief, Plaintiff alleges that since at least August 7, 2009, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, adequate structural pollutant control measures, a list of actual and potential areas of pollutant contact, or an adequate description of best

COMPLAINT

15

management practices to be implemented at the Facility to reduce pollutant discharges. According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include each of the mandatory elements required by Section A of the General Permit.

58.    As a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to channels that flow to Florin Creek, which flows into Morrison Creek, which flows into the Mokelumne River, and then into the Delta.

59.    Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

60.    Plaintiff is informed and believes that Defendant failed to submit to the Regional Board true and complete annual reports certifying compliance with the General Permit since at least June 30, 2010.  Pursuant to Sections A(9)(d), B(14), C(9) and C(10) of the General Permit, Defendant must submit an annual report that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

61.    Information available to Plaintiff indicates that, due to the continued discharge of contaminated storm water from the Facility, Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

///

///

COMPLAINT

16

**VI.   CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

62.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

63.   The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, iron, zinc, lead, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

64.   Each day since  August 7, 2009, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

65.   Defendant has been in violation of the BAT/BCT requirements every day since at least August 7, 2009.  Defendant continues to be in violation of the BAT/BCT requirements each day it fails to develop and fully implement BAT/BCT at the Facility.

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**In Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

66.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

67.   Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely affect human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water

COMPLAINT

17

1    Quality Control Plan or the applicable Regional Board's Basin Plan.

2        68.    Plaintiff is informed and believes, and thereupon alleges, that since at least

3    October 13, 2009, Defendant has been discharging polluted storm water from the Facility in

4    excess of applicable water quality standards in violation of Discharge Prohibition A(2) of the

5    General Permit.

6        69.    During every rain event, storm water flows freely over exposed materials,

7    waste products, and other accumulated pollutants at the Facility, becoming contaminated

8    with iron, zinc, pH, sediment, and other un-monitored pollutants at levels above applicable

9    water quality standards.  The storm water then discharges to channels that flow to Florin

10   Creek, which flows into Morrison Creek, which flows into the Mokelumne River, and then

11   into the Delta.

12       70.    Plaintiff is informed and believes, and thereupon alleges, that these discharges

13   of contaminated storm water are causing or contributing to the violations of the applicable

14   water quality standards in a Statewide Water Quality Control Plan and/or the applicable

15   Regional Board's Basin Plan, in violation of Receiving Water Limitation C(2) of the General

16   Permit.

17       71.    Plaintiff is informed and believes, and thereupon alleges, that these discharges

18   of contaminated storm water are adversely affecting human health and the environment in

19   violation of Receiving Water Limitation C(1) of the General Permit.

20       72.    Every day since at least October 13, 2009, that Defendant has discharged and

21   continues to discharge polluted storm water from the Facility in violation of the General

22   Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

23   These violations are ongoing and continuous.

24                        **THIRD CAUSE OF ACTION**

25           **Failure to Prepare, Implement, Review, and Update**
             **an Adequate Storm Water Pollution Prevention Plan**
26        **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

27       73.    Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth

28   herein.

COMPLAINT

18

74.     Section A and Provision E of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

75.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various pipe and precast concrete products without appropriate best management practices; the outdoor operation of precast concrete manufacturing equipment; the continued exposure of significant quantities of materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of water quality standards and EPA benchmark values.

76.     Defendant has failed to adequately update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

77.     Each day since August 7, 2009, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

78.     Defendant has been in violation of the SWPPP requirements every day since August 7, 2009.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

79.     Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

80.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than

COMPLAINT

October 1, 1992.

81.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by its failure to sample its storm water discharges for lead, zinc, and iron on a variety of sampling events as alleged above.

82.     Each day since August 7, 2009, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## FIFTH CAUSE OF ACTION
### False Certification of Compliance in an Annual Report
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

83.     Plaintiff re-alleges and incorporates the above paragraphs, as if fully set forth herein.

84.     Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least June 30, 2010.

85.     Each day since at least June 30, 2010, that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains the false certification of its compliance with the General Permit.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.   Enjoin Defendant from further violating the substantive and procedural

COMPLAINT

requirements of the General Permit;

    d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT, and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

    e.   Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

    f.   Order Defendant to prepare a SWPPP consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

    g.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

    h.   Order Defendant to pay civil penalties of $37,500 per day per violation for each violation of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

    i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

    j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

    k.   Award any such other and further relief as this Court may deem appropriate.

Dated:  October 6, 2014          Respectfully submitted,

                         LOZEAU DRURY LLP

                   By:      */s/ Douglas J. Chermak*_____
                         Douglas J. Chermak
                         Attorneys for Plaintiff
                         CALIFORNIA SPORTFISHING
                         PROTECTION ALLIANCE

COMPLAINT

# EXHIBIT A



LOZEAU DRURY LLP

T  510.836.4200     |   410 12th Street, Suite 250   |   www.lozeaudrury.com
F  510.836.4205     |   Oakland, Ca 94607            |   doug@lozeaudrury.com

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

August 6, 2014

George Rodriguez, Plant Manager          Brad George, Environmental Manager
Hanson Pipe & Precast                    Hanson Pipe & Precast, LLC
7020 Tokay Avenue                        11201 FM 529
Sacramento, CA 95828                     Houston, TX 77041


Scott Szwejbka, Senior Vice President    Greg Minteer, Vice President of Operations
Hanson Pipe & Precast                    Hanson Pipe & Precast
300 E. John Carpenter Freeway            300 E. John Carpenter Freeway
Irving, TX 75062                         Irving, TX 75062


Richard Manning, President
Hanson Building Products North America
3500 Maple Avenue
Dallas, TX 75219

**Re:    Notice of Violations and Intent to File Suit under the Federal Water
        Pollution Control Act**

Dear Messrs. Rodriguez, George, Szwejbka, Minteer, and Manning:

    I am writing on behalf of California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act (the "Act") that CSPA believes are occurring at Hanson Pipe & Precast industrial facility located at 7020 Tokay Avenue in Sacramento, California ("Facility"). CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the Sacramento River and other California waters. This letter is being sent to Hanson Pipe & Precast, LLC, Hanson Building Products North America, George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning as the responsible owners or operators of the Facility (all recipients are hereinafter collectively referred to as "Hanson Pipe").

    This letter addresses Hanson Pipe's unlawful discharge of pollutants from the Facility to channels that discharge to Florin Creek, which flows to Morrison Creek, then into the

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 2 of 13

Mokelumne River, and then into the Sacramento-San Joaquin River Delta ("Delta").  The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit").[1] The WDID identification number for the Facility listed on documents submitted to the California Regional Water Quality Control Board, Central Valley Region ("Regional Board") is 5S34I014640.  The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)).  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA") and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Hanson Pipe is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against Hanson Pipe under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more extensively below.

## I.     Background.

On October 5, 1998, the State Board received and processed Hanson Pipe's Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI").  In its NOI, Hanson Pipe certifies that the Facility is classified under SIC code 3272 ("Concrete Products Not Elsewhere Classified").  The Facility collects and discharges storm water from its 53-acre site from four outfalls.  On information and belief, CSPA alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from the Facility from areas where industrial processes occur.  The outfalls discharge to channels that flow to Florin Creek, which flows to Morrison Creek, which flows into the Mokelumne River, and then into the Delta.

The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries, which include Morrison Creek and the Mokelumne River, in "The Water Quality Control Plan (Basin

---

[1] On April 1, 2014, the State Board reissued the General Permit, continuing its mandate that industrial facilities implement the best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") and, in addition, establishing numeric action levels mandating additional pollution control efforts. State Board Order 2014-0057-DWQ. The new permit, however, does not go into effect until July 1, 2015. Until that time, the current General Permit remains in full force and effect.

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 3 of 13

Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan. *See* http://www.waterboards.ca.gov/centralvalley/ water_issues/basin_plans/sacsjr.pdf. The beneficial uses of the Delta its tributaries, including Morrison Creek and the Mokelumne River, include, among others, water contact recreation, non-contact water recreation, municipal and domestic water supply, endangered and threatened species habitat, shellfish harvesting, and fish spawning.  The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water.  These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating, . . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."  Basin Plan at II-1.00 – II-2.00.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Sacramento River for contact and non-contact water recreation.

The Basin Plan establishes water quality standards for the Delta.  It includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."  *Id.* at III-8.01.  It provides that "[w]ater shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses."  *Id.* at III-5.00.  It provides that "[w]ater shall be free of discoloration that causes nuisance or adversely affects beneficial uses." *Id.*  It provides that "[w]aters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses."  *Id.* at III-7.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."  *Id.* at III-6.00.  The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5. *Id*.

The Basin Plan also provides that "[a]t a minimum, [surface] water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Table 64449-A (Secondary Maximum Contaminant Levels ["SMCLs"]-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Containment Levels-Ranges) of Section 64449. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect. At a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/l."  Basin Plan at III-3.00.  Table 64449-A provides an SMCL for iron of 0.3 mg/L.  Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L and for zinc of 0.1 mg/L.

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 4 of 13

The EPA has adopted freshwater numeric water quality standards for iron of 0.3 mg/L (Criteria Maximum Concentration – "CMC") and for zinc of 0.120 mg/L (CMC) 65 Fed.Reg. 31712 (May 18, 2000) (California Toxics Rule).

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").[2] The following benchmarks have been established for pollutants discharged by Hanson Pipe: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; iron – 1.0 mg/L; lead – 0.095 mg/L; and zinc – 0.13 mg/L.[3]

## II.   Alleged Violations of the NPDES Permit.

### A.   Discharges in Violation of the Permit

Hanson Pipe has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit.  The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide

---

[2] The Benchmark Values can be found at:
http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf and
http://cwea.org/p3s/documents/multi-sectorrev.pdf (Last accessed on April 17, 2014).
[3] The values for zinc and lead are hardness dependent, and correspond to a total hardness of 100-125 mg/L, which is the default listing in the California Toxics Rule.

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 5 of 13

Water Quality Control Plan or the applicable Regional Board's Basin Plan.  The General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation C(2).  As a result, compliance with this provision is measured at the Facility's discharge monitoring locations.

      Hanson Pipe has discharged and continues to discharge storm water with unacceptable levels of pH, TSS, iron, zinc, and other pollutants in violation of the General Permit.  Hanson Pipe's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

      The following discharges of pollutants from the Facility have contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan and the California Toxics Rule.  They have thus violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2), are evidence of ongoing violations of Effluent Limitation B(3) of the General Permit, and constitute unauthorized discharges of  TSS, iron, zinc, and storm water associated with industrial activity in violation of Section 301(a) of the CWA.

| Date | Parameter | Observed Concentration/ Conditions | Basin Plan Water Quality Objective/ EPA California Toxics Rule | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 4/4/2013 | pH | 8.65 | 6.5 – 8.5 s.u. | #3 Parking lot south entrance |
| 11/28/2012 | pH | 8.51 | 6.5 – 8.5 s.u. | Outfall 2 (Entrance - SE Corner) |
| 2/29/2012 | pH | 8.53 | 6.5 – 8.5 s.u. | Outfall 2 (Entrance - SE Corner) |
| 2/29/2012 | pH | 8.95 | 6.5 – 8.5 s.u. | Outfall 3 (Parking Lot) |
| 4/4/2013 | Iron | 7.5 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | #3 Parking lot south entrance |
| 2/29/2012 | Iron | 5.4 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 2 (Entrance – SE Corner) |
| 2/29/2012 | Iron | 13 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 3 (Parking Lot) |
| 5/25/2011 | Iron | 4.2 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | Outfall 3 (Parking Lot) |
| 4/20/2010 | Iron | 3.08 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | #3 Parking lot south entrance |

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 6 of 13

| 10/13/2009 | Iron | 1.68 mg/L | 0.3 mg/L (WQO) / 0.3 mg/L (SMCL) | #3 Parking lot south entrance |
| 2/29/2012 | Zinc | 0.13 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | Outfall 2 (Entrance – SE Corner) |
| 2/29/2012 | Zinc | 0.21 mg/L | 0.1 mg/L (WQO) / 0.12 mg/L (CMC) | Outfall 3 (Parking Lot) |
| 2/29/2012 | Narrative | Cloudy | Basin Plan at III-7.00 | East Corner east of Parking Lot Outfall #2 |
| 2/29/2012 | Narrative | Cloudy | Basin Plan at III-7.00 | Parking Lot Outfall #3 |
| 5/25/2011 | Narrative | Cloudy | Basin Plan at III-7.00 | #3 Parking Lot Outfall |

The information in the above table reflects data gathered from Hanson Pipe's self-monitoring during the 2009-2010, 2010-2011, 2011-2012 and 2012-2013 wet seasons.[4] CSPA alleges that since August 6, 2009, and continuing through today, Hanson Pipe has discharged storm water contaminated with pollutants at levels that exceed one or more applicable water quality standards, including but not limited to each of the following:

- pH – 6.5 – 8.5 s.u. (Water Quality Objective)
- Iron – 0.3 mg/L (Water Quality Objective)
- Iron – 0.3 mg/L (Secondary MCL)
- Zinc – 0.12 mg/L (CMC)
- Zinc – 0.1 mg/L (Water Quality Objective)
- Suspended Material – Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses. (Basin Plan at III-7.00)

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2), are evidence of ongoing violations of Effluent Limitation B(3) of the General Permit and constitute unauthorized discharges of TSS, iron, zinc, and storm water associated with industrial activity in violation of Section 301(a) of the CWA.

| Date | Parameter | Observed Concentration | EPA Benchmark Value | Outfall (as identified by the Facility) |
|---|---|---|---|---|
| 4/4/2013 | Total Suspended Solids | 147 mg/L | 100 mg/L | #3 Parking lot south entrance |

[4] Although the 2013-2014 wet season has concluded, Hanson Pipe has not yet submitted its Annual Report electronically to the Regional Board.  On information and belief, CSPA alleges that Hanson Pipe's storm water sampling results from the 2013-2014 wet season contain concentrations of pollutants in excess of the water quality standards referenced in the above table.

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 7 of 13

| 4/4/2013 | Iron | 7.5 mg/L | 1.0 mg/L | #3 Parking lot south entrance |
| 11/28/2012 | Total Suspended Solids | 219 mg/L | 100 mg/L | Outfall 2 (Entrance - SE Corner) |
| 11/28/2012 | Total Suspended Solids | 352 mg/L | 100 mg/L | Outfall 3 (Parking Lot) |
| 2/29/2012 | Total Suspended Solids | 1,050 mg/L | 100 mg/L | Outfall 2 (Entrance - SE Corner) |
| 2/29/2012 | Iron | 5.4 mg/L | 1.0 mg/L | Outfall 2 (Entrance - SE Corner) |
| 2/29/2012 | Zinc | 0.21 mg/L | 0.13 mg/L | Outfall 3 (Parking Lot) |
| 2/29/2012 | Total Suspended Solids | 1,200 mg/L | 100 mg/L | Outfall 3 (Parking Lot) |
| 2/29/2012 | Iron | 13 mg/L | 1.0 mg/L | Outfall 3 (Parking Lot) |
| 2/29/2012 | Zinc | 0.21 mg/L | 0.13 mg/L | Outfall 3 (Parking Lot) |
| 5/25/2011 | Iron | 4.2 mg/L | 1.0 mg/L | Outfall 3 (Parking Lot) |
| 4/20/2010 | Iron | 3.08 mg/L | 1.0 mg/L | #3 Parking lot south entrance |
| 4/20/2010 | Total Suspended Solids | 158 | 100 mg/L | #3 Parking lot south entrance |
| 10/13/2009 | Iron | 1.68 mg/L | 1.0 mg/L | #3 Parking lot south entrance |

The information in the above table reflects data gathered from Hanson Pipe's self-monitoring during the 2009-2010, 2010-2011, 2011-2012, and 2012-2013 wet seasons.[5] CSPA alleges that since at least August 6, 2009, Hanson Pipe has discharged storm water contaminated with pollutants at levels that exceed one or more applicable EPA Benchmarks, including but not limited to each of the following:

- Iron – 1.0 mg/L
- Total Suspended Solids – 100 mg/L
- Zinc – 0.13 mg/L

---

[5] As indicated above, CSPA has thus far been unable to obtain a copy of Hanson Pipe's 2013-2014 Annual Report.  On information and belief, CSPA alleges that Hanson Pipe's storm water sampling results from the 2013-2014 wet season contain concentrations of pollutants in excess of the benchmark values.

Notice of Violations and Intent to File Suit

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 8 of 13

CSPA's investigation, including its review of Hanson Pipe's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of applicable water quality standards and EPA's benchmark values, indicates that Hanson Pipe has not implemented BAT and BCT at the Facility for its discharges of pH, iron, TSS, zinc, and other pollutants, in violation of Effluent Limitation B(3) of the General Permit. Hanson Pipe was required to have implemented BAT and BCT by no later than October 1, 1992, or since the date the Facility opened. Thus, Hanson Pipe is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the numbers listed above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including on information and belief every significant rain event that has occurred since August 6, 2009 and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Hanson Pipe has discharged storm water containing impermissible and unauthorized levels of pH, TSS, iron, and zinc in violation of Section 301(a) of the Act as well as Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.[6]

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Permit and the Act. Each discharge of storm water constitutes an unauthorized discharge of pH, TSS, iron, zinc, , and storm water associated with industrial activity in violation of Section 301(a) of the CWA. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Hanson Pipe is subject to penalties for violations of the General Permit and the Act since August 6, 2009.

### B. Failure to Develop and Implement an Adequate Monitoring and Reporting Program.

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

---

[6] The rain dates on the attached table are all the days when 0.1" or more rain was observed at a weather station in Sacramento, approximately 5.5 miles from the Facility. http://www.ipm.ucdavis.edu/WEATHER/SITES/sacramento.html (Last accessed on August 5, 2014).

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 9 of 13

      The above-referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board.  This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit.  To the extent the storm water data collected by Hanson Pipe is not representative of the quality of the Facility's various storm water discharges and that the Facility failed to monitor all qualifying storm water discharges, CSPA alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit.

      Section B(5)(c)(ii) of the General Permit requires permittees to analyze storm water discharges for toxic chemicals and pollutants likely to be present in storm water discharges from the Facility.  On information and belief, CSPA alleges that lead and zinc are likely to be present in the Facility's storm water discharges.  Section B(5)(c)(iii) of the General Permit requires permittees to analyze storm water discharges for certain parameter's based on a facility's SIC Code.  Facility with the SIC Code 3272 are required to analyze storm water samples for iron.  CSPA's investigation indicates that on several occasions, Hanson Pipe failed to analyze storm water discharges for lead and zinc, in violation of Sections B(5)(c)(ii) and (iii).  On information and belief, CSPA alleges that on the following dates, Hanson Pipe failed to analyze storm water samples for the following constituents on the indicated dates and outfalls:

- Iron – November 28, 2012 (Outfall 2 and 3)
- Zinc – November 28, 2012 (Outfall 2 and 3); April 20, 2010 (Outfall 2); October 13, 2009 (Outfall 3)
- Lead – November 28, 2012 (Outfall 2 and 3); April 20, 2010 (Outfall 2 and 3); October 13, 2009 (Outfall 3)

This results in at least 11 violations of the General Permit.

      The Facility's annual reports indicate that the Facility conducted visual monitoring of storm water discharges on days in certain months when the Facility claims that no rain occurred, when in fact, on information and belief, CSPA alleges that there were actually rain events during those same months.  A nearby weather station reported that at least 0.1" of rain occurred on working days during those same months.  See FN6.  These days were preceded by three dry days, as specified by the requirement for monthly visual observations in Section B(4)(b) of the General Permit.  On information and belief, CSPA alleges that Hanson Pipe failed to conduct the wet weather monitoring required by Section B(4) of the General Permit for the following months (in the indicated years):

- 2010:  February and November
- 2011:  January, November, December
- 2012:  January, March, April, October, December
- 2013:  January, February, March, May

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 10 of 13

These visual monitoring omissions amount to at least 14 separate violations of the General Permit.

The above violations are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Hanson Pipe is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since August 6, 2009.

###### C.    *Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.*

Section A and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated annually to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's review of conditions at Hanson Pipe and Hanson Pipe's Annual Reports indicate that Hanson Pipe has been operating with an inadequately developed or implemented SWPPP in

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 11 of 13

violation of the requirements set forth above. Hanson Pipe has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. For example, on information and belief, despite multiple assurances in its Annual Reports that it would implement BMPs to reduce the iron concentrations in its storm water discharges, the Facility has failed to adequately evaluate and revise its BMPs to reduce those iron concentrations. Hanson Pipe has been in continuous violation of Section A and Provision E(2) of the General Permit every day since August 6, 2009, and will continue to be in violation every day that Hanson Pipe fails to prepare, implement, review, and update an effective SWPPP. Hanson Pipe is subject to penalties for violations of the Order and the Act occurring since August 6, 2009.

### D. *Failure to File True and Correct Annual Reports.*

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

For the previous three years, Hanson Pipe and its agents George Rodriguez and Kevin Langley, inaccurately certified in their Annual Reports that the facility was in compliance with the General Permit. Consequently, Hanson Pipe has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Permit every time Hanson Pipe failed to submit a complete or correct report and every time Hanson Pipe or its agents falsely purported to comply with the Act. Hanson Pipe is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since June 30, 2010.

## III. Persons Responsible for the Violations.

CSPA puts Hanson Pipe & Precast, LLC, Hanson Building Products North America, George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Hanson Pipe on notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Parties.

The name, address and telephone number of California Sportfishing Protection Alliance is as follows:

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 12 of 13

      Bill Jennings, Executive Director
      California Sportfishing Protection Alliance
      3536 Rainier Avenue
      Stockton, CA 95204
      Tel. (209) 464-5067
      deltakeep@me.com

**V.      Counsel.**

      CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

      Douglas J. Chermak
      Michael R. Lozeau
      Lozeau Drury LLP
      410 12th Street, Suite 250
      Oakland, California 94607
      Tel. (510) 836-4200
      doug@lozeaudrury.com
      michael@lozeaudrury.com

**VI.      Penalties.**

      Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Hanson Pipe to a penalty of up to $37,500 per day per violation for all violations.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

      CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  CSPA intends to file a citizen suit under Section 505(a) of the Act against Hanson Pipe and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, CSPA would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, CSPA suggests that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  CSPA does not intend

George Rodriguez, Brad George, Scott Szwejbka, Greg Minteer, and Richard Manning
Hanson Pipe & Precast
August 6, 2014
Page 13 of 13

to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Douglas J. Chermak
Lozeau Drury LLP
Attorneys for California Sportfishing Protection Alliance


cc via first class mail:     CT Corporation System
                             Agent for Service of Process for Hanson Pipe & Precast LLC
                             (Entity No. 200914610082)
                             2710 Gateway Oaks Drive, Suite 150N
                             Sacramento, CA 95833

Notice of Violations and Intent to File Suit

## <u>SERVICE LIST – via certified mail</u>

Gina McCarthy Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Jared Blumenfeld, Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Pamela C. Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA  95670-6114

**ATTACHMENT A**

Rain Dates, Hanson Pipe and Precast, Sacramento, CA

| | | |
|---|---|---|
| 9/14/2009 | 10/23/2010 | 3/24/2011 |
| 10/13/2009 | 10/24/2010 | 3/25/2011 |
| 10/14/2009 | 11/7/2010 | 3/26/2011 |
| 10/19/2009 | 11/19/2010 | 5/15/2011 |
| 11/20/2009 | 11/20/2010 | 5/16/2011 |
| 12/6/2009 | 11/27/2010 | 5/17/2011 |
| 12/7/2009 | 12/2/2010 | 5/25/2011 |
| 12/11/2009 | 12/3/2010 | 6/4/2011 |
| 12/12/2009 | 12/4/2010 | 6/28/2011 |
| 12/13/2009 | 12/5/2010 | 10/5/2011 |
| 12/16/2009 | 12/6/2010 | 10/10/2011 |
| 12/27/2009 | 12/8/2010 | 11/7/2011 |
| 1/1/2010 | 12/14/2010 | 11/21/2011 |
| 1/12/2010 | 12/17/2010 | 11/24/2011 |
| 1/13/2010 | 12/18/2010 | 12/15/2011 |
| 1/17/2010 | 12/19/2010 | 1/19/2012 |
| 1/18/2010 | 12/22/2010 | 1/20/2012 |
| 1/19/2010 | 12/25/2010 | 1/22/2012 |
| 1/20/2010 | 12/28/2010 | 1/23/2012 |
| 1/21/2010 | 12/29/2010 | 2/7/2012 |
| 1/23/2010 | 1/1/2011 | 2/12/2012 |
| 1/25/2010 | 1/2/2011 | 2/29/2012 |
| 2/4/2010 | 1/12/2011 | 3/13/2012 |
| 2/5/2010 | 1/13/2011 | 3/14/2012 |
| 2/6/2010 | 1/29/2011 | 3/16/2012 |
| 2/9/2010 | 1/30/2011 | 3/17/2012 |
| 2/23/2010 | 2/2/2011 | 3/25/2012 |
| 2/26/2010 | 2/16/2011 | 3/27/2012 |
| 2/27/2010 | 2/17/2011 | 3/31/2012 |
| 3/2/2010 | 2/18/2011 | 4/10/2012 |
| 3/3/2010 | 2/19/2011 | 4/11/2012 |
| 3/12/2010 | 2/24/2011 | 10/22/2012 |
| 3/31/2010 | 2/25/2011 | 10/31/2012 |
| 4/2/2010 | 3/2/2011 | 11/1/2012 |
| 4/4/2010 | 3/6/2011 | 11/16/2012 |
| 4/11/2010 | 3/13/2011 | 11/17/2012 |
| 4/12/2010 | 3/14/2011 | 11/18/2012 |
| 4/20/2010 | 3/15/2011 | 11/24/2012 |
| 4/21/2010 | 3/16/2011 | 11/27/2012 |
| 4/27/2010 | 3/18/2011 | 11/29/2012 |
| 5/10/2010 | 3/19/2011 | 12/15/2012 |
| 5/25/2010 | 3/20/2011 | 12/17/2012 |
| 5/26/2010 | 3/22/2011 | 12/21/2012 |
| 5/27/2010 | 3/23/2011 | 12/22/2012 |

Notice of Violations and Intent to File Suit

**ATTACHMENT A**
Rain Dates, Hanson Pipe & Precast, LLC, Sacramento, California

| | | |
|---|---|---|
| 12/23/2012 | 5/6/2013 | 2/9/2014 |
| 12/25/2012 | 6/24/2013 | 2/26/2014 |
| 1/5/2013 | 6/25/2013 | 2/28/2014 |
| 1/6/2013 | 9/2/2013 | 3/3/2014 |
| 1/23/2013 | 9/21/2013 | 3/5/2014 |
| 2/19/2013 | 11/19/2013 | 3/10/2014 |
| 3/5/2013 | 11/20/2013 | 3/26/2014 |
| 3/6/2013 | 12/6/2013 | 3/29/2014 |
| 3/19/2013 | 1/30/2014 | 3/31/2014 |
| 3/20/2013 | 2/5/2014 | 4/1/2014 |
| 3/30/2013 | 2/6/2014 | 4/25/2014 |
| 3/31/2013 | 2/7/2014 | 5/5/2014 |
| 4/4/2013 | 2/8/2014 | |